[Cite as *Fritch v. Univ. of Toledo College of Medicine*, 2011-Ohio-368.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SHIRLEY A. FRITCH

    Plaintiff

    v.

THE UNIVERSITY OF TOLEDO COLLEGE OF MEDICINE

    Defendant
    Case No. 2008-03564

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff brought this action alleging medical negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} In May 2006, plaintiff first saw Krishna Mallik, M.D., an orthopedic surgeon employed by defendant, for left shoulder pain that had existed for several years. After physical therapy did not significantly improve her condition, she was scheduled for surgery on her left shoulder. On August 23, 2006, Drs. Mallik and Phillip Nowicki, a resident, performed a hemiarthroplasty procedure during which time a Copeland prosthesis was placed in plaintiff's left shoulder joint. Plaintiff asserts that during the surgery, she sustained an injury to her brachial plexus, which has resulted in permanent harm, including nerve damage and a "clawed" left hand.

**PLAINTIFF**

{¶ 3}   Plaintiff testified that she was referred to Dr. Mallik for pain and difficulty of movement with her left shoulder; that she signed a consent form prior to the surgery; that when she was in the recovery room her arm was "frozen up"; that a few days after the procedure she was taken to the Emergency Room at defendant's hospital for treatment of her pain; and that during the first follow-up visit after the surgery, she described her condition to Dr. Mallik as feeling as if she were "paralyzed."

{¶ 4}   On cross-examination, plaintiff stated that at the time of the surgery she lived alone but that after the surgery, a health aide came to her house for two hours per day on week days and helped her put on the sling that had been prescribed.  However, plaintiff stated that on the weekends, she had no one to help her, and she could not put the sling on by herself.

**KRISHNA MALLIK, M.D.**

{¶ 5}   Krishna Mallik, M.D., testified that she is currently licensed in Arizona as an orthopedic surgeon and that when she worked at defendant's hospital she was also an assistant professor of medicine.  Dr. Mallik stated that she first examined plaintiff on May 16, 2006, during which time she prescribed physical therapy to increase range of motion.   However, plaintiff's pain persisted and a decision was made to perform surgery.  On August 23, 2006, Dr. Mallik, with the assistance of Dr. Nowicki, performed a humeral head resurfacing, which is a version of a hemiarthroplasty.[1]  Prior to plaintiff's surgery, Dr. Mallik had performed this type of surgery approximately five times per month for 1.5 years.  Dr. Mallik explained that plaintiff was given a left inter-scalene block of anesthesia prior to surgery, which she described as a method to decrease the function of the nerves off of the cervical spine in order to reduce overall pain during surgery.

{¶ 6}   Dr. Mallik testified that she performed the procedure in the "beach chair" position, where plaintiff was seated upright with her arm secured against her body.  Dr. Mallik explained that in such position, the arm is never placed outward, and no traction

---

[1]Plaintiff signed an "informed consent to medical or surgical procedure" on August 10, 2006, wherein she authorized Dr. Mallik and a resident physician to perform a "left shoulder arthroscopy, subacromial decompression and rotator cuff repair" and a "possible open hemiarthroplasty."  (Defendant's Exhibit A, Page 41.)

is used. Dr. Mallik stated that if something in surgery does not go as planned, her standard practice is to note it in the operative report; that she did not note anything out of the ordinary in plaintiff's operative report; and that she was present in the operating room for the entire surgical procedure.

{¶ 7} According to Dr. Mallik, on August 31, 2006, when plaintiff presented for her post-operative visit, she was not wearing her sling properly. Dr. Mallik testified that she had prescribed an "ultra sling" for plaintiff to wear postoperatively, and described it as a pillow that goes around the patient's waist, with a sling attached to the pillow with velcro. Dr. Mallik explained that the proper position to wear the sling is with the elbow resting in the apex or back end of the sling with the sling extending beyond the fingertips so that the entire upper extremity is protected. The pillow then is positioned like a belt around the patient's waist to support the sling and take any pressure off of the neck. However, Dr. Mallik noted at the post-operative visit that plaintiff's arm was hanging midway out from the sling; that the pillow had been twisted around her body; that the manner in which plaintiff was wearing the sling was putting pressure underneath her armpit; and that plaintiff's arm was in a dependent position, causing swelling. Dr. Mallik further stated that plaintiff's improper use of the ultra sling was putting pressure on her neck, because instead of the pillow acting as the support, the neck was acting as support. Dr. Mallik delayed removal of the staples from surgery due to the swelling of plaintiff's arm. On September 7, 2006, Dr. Mallik saw plaintiff again and urged her to either move in with a family member or move to an extended care facility.

{¶ 8} Dr. Mallik testified that she had been hesitant to perform surgery on plaintiff because she feared that plaintiff did not have adequate support at home for post-operative protocol. Dr. Mallik stressed that it was very important that plaintiff not use her left arm for six weeks after surgery. Dr. Mallik stated that she would not have agreed to perform the surgery if she had known that plaintiff's son stayed with her for only one day after surgery and that the home health aide was there for only two hours per day and not on the weekends.

{¶ 9}   Dr. Mallik examined plaintiff's shoulder on a bi-weekly basis for 11 months after her surgery.   Dr. Mallik testified that she was "very concerned" about plaintiff's social situation and about her not wearing her sling properly.

{¶ 10} Dr. Mallik opined that there were two possible causes of plaintiff's injury: either not wearing the sling properly or a complication from the inter-scalene block used in anesthesia.  Dr. Mallik could not state which possibility was the more probable cause of injury.


**PHILIP NOWICKI, M.D.**

{¶ 11} Philip Nowicki, M.D., testified that he is licensed to practice medicine in Ohio; that in 2006 he was a resident; that plaintiff's surgery was the first time that he had assisted with a Copeland procedure; that he did not recall anything out of the ordinary during the procedure; that both he and Dr. Mallik stayed in the operating room at all times during the procedure; and that it is critical that there not be excessive traction or stretching of the shoulder during the procedure.


**STEVEN FARRELL, M.D.**

{¶ 12} Steven Farrell, M.D., testified that he is board-certified in physical medicine with a rehabilitation specialty and that he treats patients with neurologic or musculoskeletal disabilities.  Dr. Farrell stated that plaintiff was his patient prior to the surgery; that she complained to him of shoulder pain; that he ordered an MRI and referred her to Dr. Mallik for surgery; and that he saw plaintiff for follow-up visits after the surgery.

{¶ 13} On October 25, 2006, Dr. Farrell performed an electro diagnostic study, an EMG and nerve conduction studies of plaintiff's left arm and shoulder.  Dr. Farrell diagnosed plaintiff with a severe brachial plexopathy, which involved damage to both the myelin and the nerve fibers.  Dr. Farrell stated that the nerve conduction study shows that there is a nerve injury, but does not show what caused the injury.

{¶ 14} Dr. Farrell opined that he could not draw any direct conclusion about the cause of plaintiff's brachial plexopathy, but noted that her injury is permanent.   Dr.

Farrell further stated that plaintiff did not suffer from a brachial plexopathy prior to her surgery.

## ANTHONY BRAIDA, M.D.

{¶ 15} Anthony Braida, M.D., testified that he is licensed to practice medicine in Ohio, that he holds a specialization in anesthesiology, and that he performed the inter-scalene block on plaintiff prior to her surgery. Dr. Braida explained that he used ultrasound to assist with visualization of the nerves between the anterior scalene and middle scalene muscles so that the needle could be placed with greater accuracy. Dr. Braida has performed this procedure routinely since 1995, and he stated that plaintiff tolerated the procedure well. Dr. Braida testified that in his opinion, the inter-scalene block was not the cause of plaintiff's nerve damage. Dr. Braida explained that during the inter-scalene block, the needle is inserted into a location on the neck where the trunks of the nerves are situated. If the placement of the needle for the inter-scalene block were the cause of the nerve damage, Dr. Braida believed that the damage would have been located higher up in the neck where the needle was inserted. However, the medical records reveal that the nerve damage occurred distal to the infraspinatus muscle, beyond the trunks of the nerve. Dr. Braida stated that he could not render an opinion as to the proximate cause of the brachial plexopathy.

## JEROME UNATIN, M.D.

{¶ 16} Plaintiff's expert, Jerome Unatin, M.D., testified that he is licensed to practice medicine in the states of California and Florida; that he has practiced orthopedic surgery since 1971; that he is board-certified in orthopedic surgery; and that he has performed hemiarthroplasty procedures.

{¶ 17} Dr. Unatin stated that the operative report from plaintiff's surgery, which he described as "a very good report," showed that there were no complications during the surgery. However, subsequent to surgery, plaintiff was diagnosed with a brachial nerve palsy, which meant that she suffered neurological deficits to her upper extremity. Dr. Unatin opined that "something happened in surgery" to cause the nerve damage. Dr. Unatin explained that the nerve damage could have been caused by either some

traction on the nerves during surgery; some bleeding that the surgeons did not see; by stretching the nerve when they stretched the arm; or from a complication during the inter-scalene block used during anesthesia. Dr. Unatin opined that the most probable causes of plaintiff's injury were either the stretching of the nerve in surgery from excessive moving of the arm or over-retracting near the nerve. Dr. Unatin further opined that either of those two occurrences represent a deviation from the standard of care.

{¶ 18} Dr. Unatin admitted that he has never used a Copeland prosthesis in performing a hemiarthroplasty of a shoulder; that moving the arm and manipulating the shoulder are required in order to properly place the prosthesis and that the operative note does not reveal the cause of plaintiff's injury. However, in Dr. Unatin's opinion, it is highly unlikely that plaintiff's injury occurred subsequent to surgery absent some "traumatic" occurrence.

**DR. ROBERT GOITZ, M.D.**

{¶ 19} Defendant's expert, Robert Goitz, M.D., testified that he is an associate professor in the department of orthopedic surgery and the chief of hand and upper extremity surgery at the University of Pittsburgh Medical Center; that he is board-certified in orthopedic surgery; that 20 to 30 percent of his practice is shoulder surgery; that he is a specialist in nerve surgery involving the upper extremity; and that a large part of his practice deals with brachial plexus injury.

{¶ 20} Dr. Goitz explained that a Copeland hemiarthroplasty is the replacement of the cup side of the ball and socket of the shoulder and that nerve injury and dysfunction are known risks of such surgery. Dr. Goitz testified that unless there is an identified cut to the nerve, it is usually supposition to find the cause of nerve dysfunction.

{¶ 21} Dr. Goitz opined that there are many different potential causes of plaintiff's brachial plexopathy, but that there is no evidence of a severing of the nerves. Dr. Goitz identified two potential causes of plaintiff's nerve injury. First, a stretch injury, which he explained is always a potential cause of nerve dysfunction after extremity surgery. Second, brachial neuritis, which he defined as nerve dysfunction caused by the stress

of surgery itself. Dr. Goitz identified plaintiff's risk factors as the surgery itself; her age; her weight; and her limited range of motion. Dr. Goitz also stated that plaintiff's post-operative course, including not wearing her sling properly and not having constant in-home care, could have resulted in nerve injury. Dr. Goitz further testified that the contracture or "clawing" of plaintiff's left hand was not the result of a nerve injury itself; rather it was a result of "disuse" or neglect or limiting the motion of her arm subsequent to the surgery. Although Dr. Goitz could not render an opinion as to the cause of plaintiff's injury, he did opine that he saw no evidence that either Dr. Mallik or Dr. Nowicki violated the standard of care. Dr. Goitz conceded that plaintiff did not suffer from a brachial plexus injury prior to her surgery.

**LAW**

{¶ 22} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph 1 of the syllabus.

{¶ 23} "[E]xpert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue." *Stinson v. England*, 69 Ohio St.3d 451, 1994-Ohio-35, paragraph one of the syllabus.

**FINDINGS**

{¶ 24} Upon review of all the evidence, the court finds that plaintiff has failed to prove that acts or omissions by Drs. Mallik or Nowicki proximately caused her brachial plexopathy. Dr. Unatin's testimony that the most probable cause of plaintiff's injury was either stretching the nerves in surgery or over-retracting is not supported by the weight

of the evidence. For example, Dr. Mallik testified that the procedure was performed in the "beach chair" position to ensure that no excessive traction was used with regard to plaintiff's arm. Moreover, the court finds that the testimony of Dr. Goitz was more persuasive than the testimony of Dr. Unatin. The court finds that there were multiple possible causes of plaintiff's injury, including something that happened during surgery, the surgery itself, a complication from the inter-scalene block, or plaintiff's failure to wear the ultra sling properly. The court finds that plaintiff has failed to prove by a preponderance of the evidence that the failure to perform the surgical procedure in accordance with the standard of care was the proximate cause of plaintiff's injury.

**RES IPSA LOQUITUR**

**{¶ 25}** Plaintiff argues that the doctrine of res ipsa loquitur should be applied in this case; however, the court does not agree. The doctrine of res ipsa loquitur is a rule of evidence which allows the trier of fact to draw an inference of negligence from the facts presented. *Morgan v. Children's Hospital* (1985), 18 Ohio St.3d 185, 187. The two prerequisites which must be met to warrant the application of the rule are: "1) that the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and 2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." *Morgan*, supra, quoting *Hake v. Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66-67.

**{¶ 26}** Dr. Goitz testified that he could not render an opinion to a reasonable degree of medical probability as to the proximate cause of plaintiff's injury. However, one possible cause of injury that he recognized was plaintiff's failure to wear the ultra sling properly. Moreover, Dr. Goitz testified that nerve injury is a known risk of a hemiarthroplasty. Therefore, the court finds that neither prerequisite for the doctrine of res ipsa loquitur has been met.

**{¶ 27}** For the foregoing reasons, the court finds that plaintiff has failed to prove her claims of medical negligence by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SHIRLEY A. FRITCH

Plaintiff

v.

THE UNIVERSITY OF TOLEDO COLLEGE OF MEDICINE

Defendant

Case No. 2008-03564

Judge Joseph T. Clark

JUDGMENT ENTRY

This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Alan L. Mollenkamp
411 North Michigan Street, Suite 300
Toledo, Ohio 43604

Anne B. Strait
Naomi H. Maletz
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

HTS/cmd
Filed January 11, 2011
To S.C. reporter January 27, 2011